### IN THE
### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| SUZANNE M.,<br>        Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>        Defendant. | Case No. 1:17-cv-1425-JES-JEH |

### Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 12), the Commissioner's Motion for Summary Affirmance (Doc. 16), and the Plaintiff's Reply (Doc. 18). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Commissioner's Motion for Summary Affirmance be granted.

### I

Suzanne M. filed her application for disability insurance benefits (DIB) on September 22, 2014. She alleged disability beginning on October 15, 2017. Her date last insured was March 31, 2013. Her claim was denied initially on January 2, 2015 and was denied upon reconsideration on February 25, 2015. Suzanne filed a request for a hearing concerning her application for DIB on March 19, 2015. A hearing was held before the Honorable Gerard J. Rickert (ALJ) on June 8, 2016. At that hearing, Suzanne was represented by counsel. Following the hearing, Suzanne's claim was denied on September 16, 2016. Her request for review by the Appeals Council was denied on July 21, 2017, making the ALJ's Decision the final

1

decision of the Commissioner. Suzanne filed the instant civil action seeking review of the ALJ's Decision on September 19, 2017.

## II

Suzanne was 47 years old on the alleged disability onset date, and at the time she applied for DIB she was living in Dunlap, Illinois. At her June 8, 2016 hearing, Suzanne testified that she lived with her husband. On her Form SSA-3368, Suzanne listed the physical and mental conditions that limited her ability to work as follows: Primary Immune Deficiency Disease; history of thyroid cancer – stage 2; hypothyroidism; chronic post radiation gland and tissue damage; adrenal insufficiency; chronic pain; chronic fatigue; chronic lymphedema; biochemically induced depression; and biochemically induced anxiety. AR 205.

At the hearing, Suzanne testified that she received a Master's degree in social work and clinical social work in 1986. She last worked in 2010 and 2011 writing for an alumni publication for a university. From 2005 to 2007, Suzanne was a full-time clinical social worker at Children's Hospital of Philadelphia. She also served as program manager for the pediatric stroke program. She had done similar work as a clinical social worker for previous employers. Suzanne explained that she stopped working in 2007 when she was no longer able to work and to perform all of her duties due to continued infections, pain, fatigue, and fevers following radial iodine treatment in early 2007. She did not maintain her professional license and had not done so since her family left Philadelphia and she stopped working.

Suzanne also testified that she had an immune disorder, "underlying" endocrine issues, and adrenal insufficiency. AR 61. She stated that the "main thing" that was happing and was "likely an ongoing underlying issue probably most of [her] life" was a form of primary immune deficiency. AR 62. She commented that it "look[ed] like" her thyroid removal surgery and radial iodine

treatment put that primary immune deficiency "into play" and made her more vulnerable to it. *Id*. She took Bactrim when she had a flare, mostly alternated between Omnicef and Augmentin, and took antibiotics prophylactically daily. She infused with immunoglobulin six out of seven days a week. She began that treatment in March 2014.

Suzanne primarily saw two physicians – her primary care physican Kristen A. Chambers-Damm, M.D. and immunologist Sakina Bajowala, M.D. Suzanne remained in frequent phone and email contact with Dr. Bajowala in addition to her in-person appointments. She was referred to Dr. Bajowala after her date last insured and seven years after her alleged onset date. Suzanne further provided that while she did not realize she had immune deficiency, she had symptoms for many years. After moving from Philadelphia to Michigan due to her husband's employment, Suzanne took "a lot" of medications, spent time at home resting, wrote as she was able, did yoga, walked as she was able, tried to interact with her family and friends, and had brief social outings. AR 64.

Upon questioning by her attorney, Suzanne testified that she stopped her work writing in 2010 and 2011 because it was very difficult for her to meet deadlines. She found herself with frequent infections which caused fatigue trying to fight them off. Suzanne additionally testified to joint pain and fevers often. As the day went on, it could be very difficult for Suzanne to focus, think about things, and be able to do things with any accuracy. She did have "some better times in the mornings[.]" AR 65. In the year following her family's move in 2012 to Illinois, Suzanne's infections became more frequent and she experienced different types of infections. "We were seeing a series of a lot of different infections that were happening along with an unexplained 15-pound weight loss as well, which we were trying to figure out why." AR 66. It was particularly during 2013 when

Suzanne was on "constant antibiotics." *Id*. She thought November to December 2012 was when things "got worse" and continued through all of 2013. *Id*.

Suzanne explained she had recurrent shingles. While antibiotics helped her bacterial infections, her immunoglobulin treatment did not address her vulnerability to viruses. When she began treating with Dr. Bajowala in February 2014, Suzanne discussed her full history, especially the past year, with the doctor. Suzanne provided that Dr. Bajowala "felt that considering [Suzanne's] history" that she fit the profile of someone who had struggled with immune deficiency "probably their whole life." AR 67-68. Dr. Bajowala said to Suzanne that it was not uncommon in adults who have immune deficiency "at a lower level" throughout their lives to have something "push them over the edge" so that the deficiency fully presents itself. AR 68. Suzanne testified that things had become worse since her date last insured of March 31, 2013. After that, she still dealt with frequent infections "a number of different times" and weight loss. *Id*. She explained the immunoglobulin therapy is not a cure but rather so that she will not get worse or become hospitalized with a more severe infection. Suzanne experienced side effects from it including headaches and fatigue and she said it was a time consuming treatment. She developed septic meningitis when she first started that treatment. Attempts to withdraw from her prophylactic oral antibiotics were unsuccessful.

Suzanne further testified that between 2007 and early 2013, she slowly found herself unable to do as much as she had done previously. She explained that if she had a good day, she could drive a bit in the morning a short distance. She hired cleaning help and others to help her with errands because she had previously relied upon her family to help with errands. Her husband helped her do things. She waited for "better days" to do laundry and cooking. If she had a good day, Suzanne would go to book club at the library or she would go to church.

There were many times she cancelled things. She stated that she had pain in the night, especially joint pain. She would feel fatigued from the pain or from an active infection such as a "salivarian sinus infection." AR 71. She generally experienced fatigue and difficulty focusing. Suzanne testified that between 2007 and 2012 she never had good days, instead, she had a few hours within a day where she "might be able to do more." AR 71-72. She had one to two days within a week, if she were lucky, that were good days. She said the time from 2007 to 2013 was "somewhat better." AR 72. Suzanne concluded her testimony by explaining just how much she missed work and that she "would give anything to go back." AR 74.

Finally, the ALJ and Suzanne's attorney discussed the possibility that the ALJ would obtain review of her records by a medical expert. The attorney strongly suggested the expert be a specialist in immunology.

III

In his Decision, at Step Two, the ALJ determined that Suzanne had the severe impairments of history of thyroid cancer with hypothyroidism and residual symptoms including multiple joint pains. AR 20. The ALJ determined that Suzanne's medically determinable mental impairments of anxiety and depression, considered singly and in combination, did not cause more than minimal limitation in her ability to perform basic mental work activities. The ALJ therefore concluded her anxiety and depression were nonsevere. The ALJ continued that in making that finding, he considered the four broad functional areas, the "paragraph B" criteria, set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). He found mild limitations in Suzanne's activities of daily living, social functioning, and concentration, persistence, or pace, and she had no episodes of decompensation.

5

The ALJ made the following residual functional capacity (RFC) finding: "[T]hrough the date last insured, the claimant had the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)."  AR 22. In making that finding, the ALJ detailed Suzanne's hearing testimony, her medical history pertaining to thyroid cancer which was operated on in December 2006, her iodine therapy in February 2007, and the medical records pertaining to lingering thyroid issues.  The ALJ also detailed Suzanne's complaints of oral pain, gland swelling, ear and jaw pain, and sinus pain.  At different times between July 2007 and February 2008 she had dysphagia, fatigue, tachycardia, mood changes, severe gland swelling, left parotid sialadenitis[1], nasal and congestion symptoms, and salivary gland dysfunction on the left side.  She was treated with medications and reported in December 2007 that her ear pain and jaw pain were somewhat relieved by medication and acupuncture.  Between November 2008 and May 2012 she presented to her primary care doctor and reported thyroid problems, "swinging energy levels," a slight cold and three viral illnesses within the past month in December 2008, emotional symptoms, pain in the sinus area, and muscle cramping at night.  During that period she took Augmentin, took T3 medication, took sleep medication, and followed a diet.  Upon taking the medications and following a diet, Suzanne reported improvement.

After stent placement to treat her gland issues, Suzanne reported in September 2009 that it was not very helpful and continued to have discomfort and swelling, particularly in the left parotid gland.  She chose to treat her symptoms conservatively with massage and hydration rather than undergo a parotidecomy. The ALJ also discussed the results of a September 2010 CT scan that showed scattered mucosal thickening of all the paranasal sinuses without aggressive

---

[1] Sialadenitis is defined as the inflammation of a salivary gland.  DORLAND'S ONLINE DICTIONARY, *available at* https://www.dorlands.com/dorlands/def.jsp?id=100096651 (last visited November 27, 2018).

features and a September 2011 CT scan that was unremarkable. Throughout the relevant time, Suzanne's medications were adjusted, she took antibiotics, and she used acupuncture to treat her joint pain. The ALJ found that despite the objective findings in the record, the medical record did not support the allegation of an inability to perform all wok activity. AR 25.

The ALJ discussed how records from September 2011 showed Suzanne had only three reported infections in a year; she was on antibiotics in December 2010, April 2011, and September 2011; and after she was on antibiotics her symptoms cleared up and she did well for a period of time. The ALJ also noted the records showed Suzanne had periodic infections only every 3-4 months with Augmentin. The ALJ pointed out that despite Suzanne's allegations of severe joint pain, she only sporadically mentioned it to her primary care doctor, and the doctor's physical examinations did not reveal significant deficits and instead showed full range of motion of all joints and full strength in all upper and lower extremities.

The ALJ next acknowledged that Suzanne began treatment with an immunologist after her date last insured, was started on immune globin replacement therapy, and then developed several complications. That degree of symptomology was not documented prior to her date last insured in March 2013. Rather, the ALJ observed that Suzanne's own primary care doctor noted that her infections did not start increasing until April 2013. The ALJ proceeded to consider the opinion evidence of record including Suzanne's primary care Dr. Chambers-Damm's and her immunologist Dr. Bajowala's narrative statements. The ALJ also summarized the medical expert Dr. Russell Maples, M.D.'s opinion and ultimately gave more weight to his opinion than to Suzanne's treating doctors' opinions. The ALJ gave little weight to the State Agency doctors' opinions because they found there was insufficient evidence to evaluate Suzanne's condition prior to the date last insured.

At Step Four, the ALJ determined Suzanne was capable of performing her past relevant work as a clinical social worker. "This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity." AR 27. The ALJ noted Suzanne's Work History Report revealed she worked as a clinical social worker at various times between 1992 and 2007 such that she performed that work within the requisite past 15 years, she had sufficient time to learn the job demands, and she worked at substantial gainful activity levels such that her past job qualified as past relevant work (PRW).

## IV

Suzanne argues: 1) the ALJ erred in finding that she could PRW as a clinical social worker; 2) the ALJ erred in failing to consider the combined effect of her medically determinable impairments; 3) the ALJ erred in weighing medical opinion evidence; and 4) the ALJ erred in assessing her RFC as well as her subjective allegations that addressed the intensity, persistence, and limiting effects of her pain and symptoms.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind

might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)      currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)      suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)      suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Suzanne claims error on the ALJ's part at Step Four. Though Suzanne first argues that the ALJ erred in finding that she could perform her past relevant work, the Court begins its analysis with Suzanne's arguments relevant to the ALJ's RFC finding.

### A

A claimant's RFC "is the most he can still do despite his limitations." 20 C.F.R. § 404.1545(a). An RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe[.]" *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).

1

In this case, Suzanne argues that the ALJ improperly focused solely upon her physical impairments when he assessed her RFC. She contends he failed to explain how he considered anxiety and depression affected her pain and to explain why her fatigue and lack of energy did not affect her ability to remain on task and to maintain concentration and work at a consistent pace. The Commissioner argues that Suzanne overlooks the ALJ's specific findings at Steps Two and Three, there is no evidence that her nonsevere impairments made her pain worse, and she falsely asserts that the ALJ had to disprove all of her subjective complaints in order to deny her claim for benefits.

At Step Two, the ALJ first stated that Suzanne's history of thyroid cancer with hypothyroidism and residual symptoms including multiple joint pains were severe because they had "more than a minimal effect of the claimant's ability to perform basic work activities." AR 20. In his consideration of Suzanne's depression and/or anxiety, the ALJ addressed the four broad functional areas set out in the disability regulations for evaluating mental disorders. The ALJ determined Suzanne had mild limitation in activities of daily living, "[h]owever, she testified that many difficulties she has in this area are due to her physical symptoms, including pain and fatigue, rather than any debilitating anxiety or depression she is experiencing." AR 21. He next determined she had mild limitation in social functioning, noted that she sometimes had to cancel social activities due to her physical symptoms, and noted the record did not contain credible evidence that she was unable to interact appropriately with co-workers, supervisors, or the general public. As for concentration, persistence, or pace, the ALJ determined Suzanne had mild limitation in that functional area. He concluded her medical records did not show more limited functioning in that regard and cited to her attendance at a downstate wedding, gardening, and cooking and laundry if she was physically up to it. The ALJ continued:

> Her medical records reveals [sic] emails to her doctor showing that she
> was extremely involved in her care, including suggesting medications,
> suggesting dosage changes . . . reading about infections . . . and sending

11

emails with detailed documentation about her treatment history . . . This shows a very functional level of concentration, persistence, and pace.

AR 21. The ALJ finally stated Suzanne experienced no episodes of decompensation. The ALJ concluded his Step Two discussion by stating "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis. AR 22.

While it is true, as Suzanne contends, that the ALJ was required to consider both her severe and nonsevere impairments when he assessed her RFC, it is also true that a court should read an ALJ's decision as a whole and with common sense. *Rice v. Barnhart*, 384 F.3d 363, 369, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . . ."); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (explaining that an ALJ's opinion is given a commonsensical reading during an analysis of the opinion for fatal gaps or contradictions). Reading the Decision as a whole, it is clear the ALJ sufficiently considered both Suzanne's severe and nonsevere impairments. While he did not explicitly state that he considered them in combination when assessing Suzanne's RFC, it is apparent why the ALJ did not do so; at Step Two, the ALJ articulated that Suzanne had only mild functional limitations attributable to her *physical* symptoms rather than her mental health and even with such mild limitations she was "very functional."

Moreover, the ALJ discussed Suzanne's fatigue, lack of energy, and pain complaints when assessing her RFC and explained "the claimant's description of her symptoms and limitations is not supported by the clinical evidence." AR 25. He later added Suzanne's primary care doctor's records showed "the claimant was quite functional during [2008-2012] despite her subjective complaints." AR 26. Though the cases Suzanne cites provide that a failure to expressly consider the combined effects of severe and nonsevere impairments in crafting an RFC warranted remand, no such outcome is warranted here. The ALJ essentially considered her physical and mental impairments in combination at Step Two and

expressly addressed her complaints of fatigue, lack of energy, and pain in his consideration of her RFC.  Put simply, the ALJ made it obvious to the reader why he did not again expressly discuss Suzanne's nonsevere mental impairment when he assessed her RFC; he had already dismissed her mild limitations because they caused no real work-related limitations for which to account in her RFC.

**2**

Suzanne also argues that the ALJ erroneously considered the weight to be given her treating doctors' opinions.  She argues the ALJ failed to explain how the discussion of her pertinent medical history, examination results, and the documented presence from 2007-2013 of the very symptoms Drs. Chambers-Damm and Bajowala identified did not provide adequate support for their medical opinions.  She questions why the ALJ gave less rather than more weight to their opinions because of the opinions' consistency.  Finally, Suzanne takes issue with the ALJ's reliance on medical expert Dr. Maples' purported specialization in allergy or immunology as misplaced, particularly where Dr. Bajowala was a physician who specialized in treating her impairments.  The Commissioner responds that a non-examining source opinion may be given greater weight than an examining or treating physician's opinion if warranted by the regulatory factors.  The Commissioner further argues the regulatory factors support the ALJ's determination as to the weight given the medical opinions of record such that there is no reversible error.

An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence."  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).  If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of

13

the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).[2]

The arguments Suzanne makes in her Motion and Reply amount to a request that the Court nitpick the ALJ's findings as to the medical opinions of record. Ultimately, the Court can trace the path of the ALJ's reasoning in his Decision to afford more weight to Dr. Maples' opinion than to Drs. Chambers-Damm's and Bajowala's opinions. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ considered the medical evidence that dated back to 2006. He illustrated how Suzanne's symptoms and limitations were not supported by the clinical evidence. He noted that Suzanne began treating with the immunologist, Dr. Bajowala, but also noted she did not begin treating with that doctor and was not even referred to one until nearly a year after her date last insured. The ALJ also noted, "As was pointed out by the medical expert, her treating physicians have not really evaluated her complaints to establish the diagnoses they are treating her for . . . ." AR 26. He explained:

> Despite the fact the medical expert was not a treating doctor, the record shows this doctor had the opportunity to thoroughly review all of the claimant's medical records, and all of his conclusions are supported by citation to specific medical findings in the record.

AR 27. He went on to state Dr. Maples' opinion that Suzanne was capable of light work activity was given "great weight" because it was consistent with Suzanne's physical examinations. He juxtaposed that opinion, which was consistent with

---

[2] Effective March 27, 2017, the "treating physician" rule was abolished when new Social Security regulations went into effect which rescinded several rulings. Of course, the new regulations and accompanying Social Security Rulings do not apply to this case in which the ALJ Decision made his Decision before March 27, 2017.

record evidence, with Drs. Chambers-Damm's and Bajowala's opinions which he determined were not supported by their own treating records or their negative examinations. The ALJ also explained those two treating doctors' letters did not explain why Suzanne's symptoms that improved with therapy caused persistent constitutional symptoms and the letters bore "striking similarity in their sentences, and the doctors may have used the same template for formulating their letters or gotten the language from the claimant." AR 27.

In light of all this, it is clear that the ALJ properly considered the length of treatment relationship, Dr. Bajowala's specialty, the types of tests performed (rather, not performed), and the consistency and supportability of those opinions. The ALJ's explanation for affording greater weight to Dr. Maples' opinion than to Drs. Chambers-Damm's and Bajowala's further reveals the ALJ did not rely solely upon the non-examining medical expert's opinion as substantial evidence to reject the examining physicians' medical opinions; the ALJ relied upon reasons that were themselves supported by substantial evidence in the record. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 573 (7th Cir. 2017) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice"), *citing Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). True, a conflict in the evidence remains in that Dr. Maples indicated he was board certified in allergy and immunology while Dr. Bajowala stated Dr. Maples was not so board certified. However, it was harmless error to not resolve that "conflict in evidence." First, the Court notes Dr. Bajowala basically asserted that Dr. Maples' representations as to *his own* board certifications were erroneous. Second, the ALJ identified Dr. Bajowala's specialty of immunology in his Decision. Finally, the ALJ explained that Dr. Maples' opinion was better supported for various reasons (as discussed above). The Court is therefore convinced the ALJ would reach the same

15

result to afford Dr. Maples greater weight than the treating doctors had he resolved the "conflict in evidence." *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).

3

As a catchall, Suzanne argues the ALJ's RFC assessment was erroneous as was his assessment of her subjective allegations.  She argues the ALJ failed to explain why he excluded from his assessment the functional restrictions that related to her allegation that she suffered frequent, recurrent infections.  Suzanne additionally argues that the ALJ did not include in his RFC assessment functional restrictions due to her fatigue, lumbar muscle spasm, swelling in the knees, and pain with palpation of large muscle groups.  With regard to the ALJ's assessment of her subjective allegations, Suzanne argues the ALJ ignored evidence from a throat specialist, failed to obtain any explanation as to why she did not regularly pursue treatment with medical specialists, cited no medical authority that established she would have benefited from hospitalization, and incorrectly determined her daily activities were inconsistent with her subjective allegations.  The Commissioner counters that a claimant's RFC need not reflect symptoms that were not found credible by the ALJ, the ALJ was not required to disprove Suzanne's testimony with conclusive evidence, the ALJ applied the correct legal standard in evaluating her symptoms, Suzanne was perfectly capable of testifying about her treatment history if she thought it necessary, and the ALJ ultimately drew a modest and reasonable inference from her daily activities.

As previously set forth, a claimant's RFC "is the most he can still do despite his limitations."  20 C.F.R. § 404.1545(a).  The ALJ built a logical bridge between the evidence (and lack thereof) and his RFC finding such that the Court can understand why the alleged erroneously omitted functional limitations were not included.  *See*

16

*Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014), *quoting Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (explaining that the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence). The ALJ provided that Suzanne "did have impairments that could have been anticipated to produce a certain amount of limitations, but the claimant has not demonstrated limitations in excess of those accounted for in the residual functional capacity." AR 25.

He proceeded to articulate the bases for that finding. Clinical evidence did not support Suzanne's description of her symptoms and limitations, records showed she was quite functional despite her subjective complaints, her primary care doctor's records did not reveal the alleged frequent infections, records showed her joint issues responded to acupuncture, her primary care doctor noted her infections did not start increasing until April 2013, and her exams did not document joint limitation or swelling. Also, Suzanne's allegations of frequent infections were not documented prior to her date last insured, she only sporadically mentioned severe joint pain to her primary care doctor, and Dr. Maples noted Suzanne's conditions, including infections, would not be expected to cause the fatigue she alleged. Substantial evidence supports the ALJ's RFC assessment, and more specifically, supports the omissions from it that he made.

That evidence, and more, also substantially supports the ALJ's assessment of Suzanne's subjective allegations concerning the intensity, persistence, and limiting effects of her pain and symptoms. SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms" rather than on his "credibility." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), *citing* SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities;

the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms.  SSR 16-3p, at *7.

Here, the ALJ considered Suzanne's testimony, instances when she reported treatment improved her symptoms, medications and changes to those medications, surgery she underwent due to continued pain, instances when she reported continued pain or other issues, complaints of fatigue and lack of energy, and her choice to treat symptoms conservatively with massage and hydration rather than surgery.  Though Suzanne argues the ALJ incorrectly considered the fact that she did not have any documented hospitalizations, ER visits, or frequent visits with medical specialists during the time she received treatment from her primary care physician, the ALJ permissibly considered those things pursuant to the regulatory factors.  The Court does not see where the ALJ speculated, as Suzanne argues, that in order to suffer disabling pain and symptoms, she required hospitalization.  The fact that Suzanne did not have documented hospitalizations, ER visits, or frequent visits with medical specialists shed light on the frequency and intensity of Suzanne's pain and other symptoms and also on the measures she used to relieve her pain and other symptoms.  Suzanne also specifically argues that the ALJ ignored evidence of her visits to specialists and reasons for why she did not pursue surgery.  Indeed, an ALJ has a duty to explore a claimant's explanations as to the failure to follow treatment or the receipt of infrequent treatment.  SSR 16-3p.  The error was harmless.  The ALJ cited the very records from the ear, nose, and throat specialist to which Suzanne refers, correctly observed that at one point when surgery was offered Suzanne instead chose to proceed conservatively with hydration and massage, considered her more recent treating immunologist's opinion regarding her impairments, and relied upon more than just infrequent treatment with specialists when he assessed her subjective

allegations.   An ALJ also "need not mention every strand of evidence in [his] decision."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

The ALJ additionally relied upon Suzanne's activities of daily living to support his finding that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record evidence.  After the ALJ stated that Suzanne was "quite functional" during the time period under consideration despite her subjective complaints and cited the activities she engaged in, the ALJ continued:

> While none of these evidence the ability to work, they do show the claimant was able to do more than she claims, as she testified that during this time period she spent a lot of time at home, did not leave the house other than for doctor appointments or to go to the store, and only went on brief outings.  She also reported during this time that she had definite improvement in her condition with her medication changes and change in her diet[.]

AR 26.  The Decision, in its entirety, reveals the ALJ properly considered Suzanne's daily activities as he did not equate them with activities of full-time work.  *See Penrod on behalf of Penrod v. Berryhill*, 900 F.3d 474, 478 (7th Cir. 2018) ("[T]he ALJ did not improperly equate [the claimant's] daily activities with the activities of full-time work").   The ALJ's Decision does not warrant remand on the bases that he erroneously assessed Suzanne's RFC and her subjective allegations.

### B

Suzanne additionally argues that the ALJ erred at Step Four of the adjudication process where he did not identify the particular requirements of her PRW as a clinical social worker and did not explain how he determined she retained the RFC to perform each of those job duties.  She contends the ALJ failed to explain how she could have performed the particular duties of her PRW given his finding that her anxiety and depression, medically determinable non-severe impairments, produced mild restrictions in activities of daily living, social

functioning, and concentration, persistence, or pace.  The Commissioner argues Suzanne improperly puts the onus on the ALJ to show she could do her PRW rather than on herself to establish she was unable to do it; there is no *a priori* reason to think that a mild mental impairment would prevent a person from doing any particular occupation, as functioning is only "slightly limited" and the claimant retains the "abilities and aptitudes necessary to do most jobs" (citing 20 C.F.R. § 404.1522); and the ALJ had no reason to think Suzanne lacked the reasoning development to work as a social worker and there is no evidence she, in fact, lacked the education to do the job.  Further, the Commissioner argues that even if Suzanne were to prevail on her argument that she was unable to perform her PRW, the Medical-Vocational Rules dictate a finding of not disabled for a person who can do the full range of unskilled work at the light exertional level.

Suzanne relies, in part, upon *Nolen v. Sullivan* to support her argument that the ALJ was required to identify the requirements of Suzanne's PRW and explain how she retained the RFC to perform the particular requirements.  In *Nolen*, the Seventh Circuit noted its previous holding in *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984), that an ALJ "cannot describe a claimant's job in a generic way— there, 'sedentary'—and conclude, on the basis of the claimant's residual capacity, that she can return to her previous work." 939 F.2d 516, 518 (7th Cir. 1991). "Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Id.*, *citing Strittmatter*, 729 F.2d at 509 and SSR 82-62.  Since then, the Seventh Circuit has stated that it has construed *Nolen* more narrowly than to require an ALJ to spell out in detail the demands of each prior job to which the ALJ finds the applicant able to return.  *Cohen v. Astrue*, 258 F. App'x 20, 28 (7th Cir. 2007).  Rather, an ALJ cannot describe a previous job in a generic way, e.g., sedentary, and "on that basis conclude that the claimant is fit to perform all

20

sedentary jobs without inquiring into any differences in what the job requires while sitting." *Id.*; *but see Rainey v. Berryhill*, 731 F. App'x 519, 524 (7th Cir. 2018) (faulting ALJ for failing to do a function-by-function analysis of claimant's past relevant work which would have revealed he lacked the requisite keyboarding skills and walking ability to perform it).

Here, the ALJ did not describe Suzanne's PRW only in a generic way as "sedentary" where the ALJ also stated that Suzanne "reported lifting less than ten pounds when working as a social worker." AR 28. The ALJ further considered the additional limitations suggested by the medical expert – no exposure to extreme cold and no concentrated exposure to pulmonary irritants – and determined they would not preclude Suzanne from performing her past work where the DOT did not list her PRW has having exposures to either. *Id.* Moreover, Suzanne places too much emphasis upon the ALJ's alleged failure to explain how she could have performed the particular duties of her PRW given his finding that her anxiety and depression produced mild restrictions. As discussed above, at Step Two the ALJ articulated that Suzanne had only mild functional limitations attributable to her *physical* symptoms rather than her mental health and even with such mild limitations she was "very functional." Thus, it is clear why the ALJ refrained from explicitly addressing Suzanne's nonsevere mental impairments when assessing her RFC. It is also clear why the ALJ refrained from explicitly addressing the mental requirements of Suzanne's PRW at Step Four – he earlier indicated her mild mental limitations were of no moment as they pertained to the ultimate question of disability. In any event, the ALJ identified Suzanne's PRW as a clinical social worker, Suzanne's own description of that job appeared in the record, and the ALJ cited to the record evidence where Suzanne reported how she performed that job. *See Peters v. Berryhill*, No. 16-6901, 2018 WL 1762442, at *9 (N.D. Ill. Apr. 12, 2018) (stating the general principle in *Nolen* does not apply where

an ALJ "considered the claimant's specific job and there is evidence in the record as to the duties of that job"). Though the ALJ's discussion of Suzanne's PRW could have been more fully developed, enough relevant evidence was discussed in the ALJ's Decision such that a reasonable mind could accept his Step Four finding as adequately supported.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 12) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 16) be granted; 3) judgment be entered in favor of the Defendant, Commissioner of Social Security, and against the Plaintiff, Suzanne M; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on November 29, 2018.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE